**NOT RECOMMENDED FOR FULL TEXT PUBLICATION**
File Name: 12a0386n.06

**No. 09-5516**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

*Apr 09, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| TRACY FEAGAN, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE:  KENNEDY, GIBBONS, and KETHLEDGE, Circuit Judges.

**CORNELIA G. KENNEDY, Circuit Judge.**  Defendant, Tracy Feagan ("Defendant"), appeals his conviction for conspiracy to distribute five kilograms or more of cocaine hydrochloride, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) (Count One), and conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(I) and (a)(1)(B)(I) and (h) (Count Two).  (R. 65.)  Specifically, Defendant claims that his jury verdict should be reversed, and he should be given a new trial because the district court erred in three respects.  First, he contends that the district court improperly denied his motion *in limine* and allowed the government to present evidence of separate and uncharged conspiracies to the jury.  Next, he claims the trial court erred in denying his motion to suppress evidence found pursuant to a search of his residence at 2237 Sixth Street NW, Birmingham, Alabama (the "Sixth Street" residence, address, or home).  Finally, Defendant argues that the Eastern District of Tennessee was an improper venue for his trial.  For the reasons that follow, we **AFFIRM**.

## FACTUAL BACKGROUND

Defendant was arrested for his involvement in what came to be known as the "Sanchez Conspiracy," which was headed by co-defendant Eloy "Ed" Sanchez ("Sanchez"). Sanchez lived in Phoenix, Arizona, and employed co-defendant Harry Goff ("Goff"), a long-range truck driver living in Alabama, to transport cocaine and methamphetamine to Tennessee and Alabama. Goff delivered shipments of meth to two other co-defendants, Timothy Morrow ("Morrow") and David "Buckwheat" Rector ("Rector") in Jasper, Tennessee and Stevenson, Alabama. Goff would pick the drugs up in Arizona, transport them across the country, and deliver them to customers in Tennessee and Alabama. Then he would spend his mandatory 34-hour driving layover at home in Stevenson, Alabama and wait for the customers to bring him the money for the drugs after they had sold them. Goff would then drive the money back to Sanchez in Phoenix, and repeat the process.

Goff testified that he made three deliveries of cocaine to Defendant. (R. 303 at 167, 175, 177.) In early 2007, Goff delivered 7 kilograms of cocaine to Defendant outside of Birmingham, Alabama. (*Id.* at 165-69.) His second and third shipments were each for 2 kilograms of cocaine. (*Id.* at 174-75, 177-79.) At some point after the third delivery, Goff was arrested by law enforcement agents in Georgia with 53 kilograms of cocaine. (*Id.* at 181.) After his arrest, Goff began cooperating with agents from the Drug Enforcement Administration ("DEA") under the supervision of Agent Josh Melton ("Agent Melton"), a Tennessee Bureau of Investigation agent who was assigned to the DEA Task Force in Chattanooga, Tennessee. This cooperation consisted of providing agents with information about the Sanchez Conspiracy and placing controlled phone calls, which were recorded, to Defendant. (*Id.*)

2

During one such phone call, Goff agreed to deliver 10 kilograms of cocaine to Defendant in Birmingham, Alabama. (R. 302 at 52.) Defendant and Goff arranged to meet at the Flying J truck stop. Because Goff was in custody after his arrest, Agent Melton did not allow Goff to actually go to Alabama for the buy. Instead, Agent Melton and others planned to conduct surveillance and arrest Defendant at the Flying J. Defendant, however, had an accomplice conducting counter-surveillance who detected law-enforcement vehicles at the Flying J. Accordingly, he called Goff and arranged to meet at a business parking lot near the Flying J. Agents attempted to arrest Defendant at the new location, but Defendant fled; first in the green Honda Accord he was driving, and then on foot.

Defendant was eventually apprehended, and officers found three cellular phones after searching his car. Defendant had used one of the phones to talk to Goff to set up the controlled buy. Officers ran the license plate of the Honda Defendant was driving and discovered that it was registered to Defendant's mother-in-law, Anita Murdock. Ms. Murdock told agents that the car belonged to her daughter, Oronda Bullard Feagan. She also told officers that both Ms. Feagan and Defendant drove the car and lived together at the Sixth Street address. Ms. Feagan also informed agents that Defendant lived at the Sixth Street residence. Officers also determined that a 2007 GMC Yukon parked outside the home was registered in Defendant's name to the Sixth Street address.

Officer James Wiggley, a Jefferson County, Alabama, investigator assigned to the DEA Task Force in Birmingham ("TFO Wiggley"), prepared a search warrant affidavit which he submitted to an Alabama magistrate judge. (R. 108-1.) In the affidavit, TFO Wiggley described Agent Melton's investigation of Defendant, the recorded phone calls with Goff, and Defendant's arrest. (*Id.*) The affidavit also mentioned Defendant's prior cocaine purchases and the cell phones found in the car Defendant drove to the controlled buy. TFO Wiggley explained that based on his over nine years

of experience as a narcotics investigator, which included investigating hundreds of drug cases and attending numerous training schools and seminars, it was reasonable to believe that drugs and other evidence of drug trafficking would be found in a suspected drug dealer's home. (*Id.*)

The Alabama judge reviewed TFO Wiggley's affidavit, and ultimately issued a search warrant for the Sixth Street address and any vehicles Defendant owned or possessed. The search revealed two "bricks" of cocaine in the basement, a smaller quantity of cocaine, and a set of digital scales. (R. 303 at 362-65.) Officers found crack cocaine, digital scales, six cell phones, and a loaded .40 caliber handgun inside Defendant's GMC Yukon. (*Id.* at 315-16, 340-41.) Agents also found a loaded .44 caliber handgun in the Sixth Street garage and a loaded .45 caliber handgun in the master bedroom. (*Id.* at 320-23.)

## PROCEDURAL HISTORY

After Defendant was arrested in Birmingham, Alabama on August 24, 2007, he was transported to the Hamilton County Jail in Chattanooga, Tennessee. On August 25, 2007, a criminal complaint against Defendant was filed in the Eastern District of Tennessee. (R. 1.) On October 10, 2007, the government filed a Second Superseding Indictment. (R. 65.) Defendant was indicted for conspiracy to distribute cocaine and methamphetamine (Count One) and conspiracy to launder money (Count Two).

After his initial appearance before a United States Magistrate Judge, Defendant told Agent Melton that he wanted to talk with him. (R. 303 at 393-95.) Defendant was advised of his *Miranda* rights, but said he wanted to talk to Melton anyway. (*Id.*) During this discussion, Defendant confessed that he had been dealing cocaine since the beginning of 2006. (*Id.* at 397.) He stated that

4

he learned about the Sanchez Conspiracy through a female friend named Ely, and that he received his first shipment of three kilograms of cocaine from Goff in February 2007. (*Id.* at 401-02.)

During this confession, Defendant also told Agent Melton about other sources of cocaine he had developed in Alabama. Defendant explained that he began dealing by getting 5-8 kilograms on a regular basis from "Corey" and "Matt" in Birmingham. (*Id.* at 399-401.) Although "Matt" has not been identified, "Corey" is Corey Hollinshead ("Hollinshead"). Defendant told Agent Melton that when Hollinshead got arrested in August 2006, he had to find another source of cocaine. (*Id.*) This eventually led to Defendant being put in touch with Sanchez. Defendant also discussed cocaine he purchased from Bo Agee ("Agee") in Birmingham. (*Id.* at 402-03.) Defendant purchased the two kilograms of cocaine found at the Sixth Street residence from Agee.

On January 15, 2008, Defendant filed a motion to suppress the search of the Sixth Street residence. U.S. Magistrate Judge Susan Lee held a suppression hearing on June 18, 2008, (R. 166), and on July 1, 2008 filed her Report and Recommendation ("R&R") denying the motion. (R. 171.) Judge Lee concluded that TFO Wiggley's affidavit presented sufficient evidence to establish probable cause for the search of Defendant's residence, and provided the requisite nexus between the alleged drug activity and the house. (*Id.* at 15.) Additionally, Judge Lee stated that, even assuming there was not probable cause, Defendant's motion should be denied because the executing officers' conduct falls within the "good-faith exception" to the exclusionary rule articulated by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984). (*Id.* at 16.) Chief Judge Curtis Collier adopted Judge Lee's R&R on August 11, 2008. (R. 196.)

On October 23, 2008, Defendant filed a motion *in limine* to prohibit the government from introducing what he alleged was evidence of separate, uncharged conspiracies to distribute cocaine

5

in Birmingham, Alabama with Hollinshead and Agee (the "Birmingham Conspiracies"). Defendant claimed that this evidence represented a material variance from the indicted Sanchez Conspiracy. (R. 216.) His motion was denied by District Judge Allan Edgar.[1]

On November 12 and 13, 2008, Defendant was tried by jury. At the close of the prosecutor's case, Defendant moved for acquittal based on the material variance between the evidence submitted to the jury and the charges alleged against him in the indictment. (R. 304 at 431-32.) The motion was denied, and the case was submitted to the jury. On November 14, 2008, the jury acquitted Defendant of the part of Count One that charged him with conspiracy to distribute methamphetamine. (R. 305 at 2.) The jury, however, found Defendant guilty of conspiracy to distribute cocaine and conspiracy to launder money. (*Id.*) On April 8, 2009, Defendant was sentenced to life in prison pursuant to 21 U.S.C. § 851 because of three prior drug-felony convictions. (R. 271.) On April 20, 2009, Defendant filed this timely appeal arguing that the district court erred by denying his motion *in limine*, by denying his motion to suppress the evidence found as a result of the Sixth Street search, and by finding that venue was proper in the Eastern District of Tennessee. (R. 276.) Each of Defendant's claims will be addressed in turn, but because we find each to be without merit we **AFFIRM** the jury's conviction.

---

[1] This case was transferred from Chief Judge Collier to Judge Edgar on October 24, 2008. (R. 217.) It appears that Judge Edgar first considered this motion during a discussion on the record but not in the presence of the jury between the judge and both sides' attorneys before the Defendant's trial began.

## DISCUSSION

### a.     Defendant's Motion to Exclude Evidence of the Birmingham Activities

Defendant's first assignment of error is that the district court should have excluded evidence of Defendant's cocaine purchases that were not made in connection with the Sanchez Conspiracy because such evidence represented a material and prejudicial variance from the charged crime. The United States argues that Hollinshead and Agee were simply alternative suppliers in Feagan's drug trafficking conspiracy, and, therefore, the evidence does not constitute a variance. Alternatively, even if we were to find that there was a variance, the government contends that the evidence was properly admitted under Rule 404(b) for the purpose of demonstrating Defendant's specific intent to possess cocaine with the intent to distribute. For the following reasons, we affirm the district court's decision to admit the disputed evidence.

### 1.     Was the Evidence Inadmissible Because It Constituted a Variance?

"To obtain reversal of a conviction because of a variance between the indictment and the evidence produced at trial, a defendant must satisfy a two-prong test:  (1) the variance must be demonstrated and (2) the variance must affect some substantial right of the defendant." *United States v. Osborne*, 545 F.3d 440, 443 (6th Cir. 2008) (quoting *United States v. Prince*, 214 F.3d 740, 757 (6th Cir. 2000)) (quotation marks omitted).

Whether a single or multiple conspiracies have been established is usually a question of fact to be determined by the jury after receiving proper instructions. *United States v. Rios*, 842 F.2d 868, 872 (6th Cir. 1988) (quoting *United States v. Grunsfeld*, 448 F.2d 1231, 1238 (6th Cir.), *cert. denied sub nom. Flowers v. United States*, 434 U.S. 872 (1977)). The jury's finding is reviewed on appeal

7

in the light most favorable to the government, however, the question of whether a variance has occurred is reviewed *de novo*. *United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008).

Even assuming that the evidence constituted a variance, the district court's decision should be affirmed because the evidence's admission did not affect Defendant's substantial rights. The fact that a variance has been demonstrated, standing alone is not per se prejudicial. *Osborne*, 545 F.3d at 443. "Where the evidence demonstrates only multiple conspiracies, a defendant is prejudiced if the error of trying multiple conspiracies under a single indictment substantially influenced the outcome of the trial." *United States v. Caver*, 470 F.3d 220, 237 (6th Cir. 2006) (citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1956)).

We find that the variance was not prejudicial because there was overwhelming evidence of Defendant's guilt, aside from the disputed tapes and cocaine. Indeed, Defendant's counsel found himself claiming as much while arguing that the evidence should not come in under Rule 404(b). When objecting to the admission of the recordings of the Birmingham drug deal before the start of the trial, Defendant's counsel argued "[t]hey don't need it. They've got plenty of proof based upon his admissions to Special Agent Josh Melton within days of his arrest about what his involvement was in this charged conspiracy." (R. 302 at 6:5-8.) Then again, he stated "my point on all of those issues raised by 404(b), knowledge, intent, motive, all of those things, there is plenty of proof within the many paragraphs of his confession about his involvement with Eloy Sanchez. They don't need to roam into these other[] matter[s]." (*Id.* at 14:20-24.)

Further mitigating the prejudicial effect of any variance that might have occurred is the fact that the judge issued an instruction to the jury about multiple conspiracies. This instruction clearly explained that the jury could believe Defendant's arguments that there were multiple conspiracies,

that the jury should base a conviction upon that evidence if they found multiple conspiracies.[2] Juries are presumed to follow the instructions that they are given. *United States v. Murphy*, 241 F.3d 447, 451 (6th Cir. 2001). We hold that because there was such an abundance of other evidence, including the multiple recorded phone calls between Defendant and Goff, his presence and arrest during the controlled buy, the evidence found as a result of the search of the Sixth Street residence, and most importantly Defendant's confession, any error was harmless.

## 2. Was the Evidence Admissible Under Rule 404(b)?

Although the district court ultimately believed the evidence did not constitute a variance, Judge Edgar still admitted the evidence, at least in part, on the basis of Rule 404(b).[3] When

---

[2] The following instructions regarding multiple conspiracies were given to the jury:

Count 1 charges that the defendant was a member of one single conspiracy to commit the crime of distributing methamphetamine and cocaine hydrochloride. The defendant has argued that he was part of a conspiracy other than the one charged in Count 1.

To convict the defendant under Count 1, the government must convince you beyond a reasonable doubt that the defendant was a member of the conspiracy charged in Count 1 of the indictment. If the government fails to prove this, then you must find the defendant not guilty on Count 1, *even if you find that he was a member of some other conspiracy.* Proof that the defendant was a member of some other conspiracy is not enough to convict.

(R. 304 at 494:16-495:3 (emphasis added).)

[3] Upon Defendant's motion for acquittal based on the alleged variance, Judge Edgar made the following findings:

But let me just say this. I don't think it's 404(b), number one [because it is not a variance]. But if it is, I think it is relevant because it has, it certainly has to do with his intent. And, actually, it occurred during the time of the alleged conspiracy here, and the government has to prove intent here. And this is an incident where, clearly, the defendant – there is evidence that the defendant was being provided a distribution amount of cocaine hydrochloride and in the half a brick that they split up there. So,

9

reviewing a lower court's decision to admit evidence of other crimes, wrongs, or bad acts under Rule 404(b), the reviewing court must undertake a three-step process. *See United States v. Merriweather*, 78 F.3d 1070, 1074 (6th Cir. 1996). First, we examine the district court's factual determination that the bad acts actually occurred under a clear error standard. *Id.* Next, we must review *de novo* the district court's legal finding that the evidence was admissible under Rule 404(b) for a legitimate purpose. *Id.* Finally, we must determine whether the district court abused its discretion in determining that the probative value of the evidence is not substantially outweighed by any unfair prejudice it causes under Rule 403. *Id.* The parties do not dispute that the drug deals described in the recorded phone calls that were played at Defendant's trial actually took place. As a result, only the second and third prongs require our attention.

### A. Was the Evidence Admitted for a Proper Purpose?

Rule 404(b) instructs that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be admissible for another purpose, such as prooving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident." FED. R. EVID. 404(b). In *Merriweather*, this Court carefully explained the steps courts must take to ensure Rule 404(b) is properly applied. *See* 78 F.3d at 1076-77. In order to admit evidence under Rule 404(b), the proponent of the evidence must identify the specific

---

it's for a proper purpose. I think that it did in fact occur. We had the testimony of the police officer here about that. We had a tape, which memorialized the transaction. And I don't think that there is much, much of a question here as to 403 balancing of it. I mean, it is something which the government has to prove. We've got a lot of evidence of cocaine transactions in this case, which I don't think that it's unfairly prejudicial to the defendant to have this piece of evidence come in. (R. 303 at 307:15-308:7.)

10

purpose for which the evidence is being offered. *Id.* at 1076. Furthermore, that issue must be in dispute or a fact that the statutory elements of the crime require the government to prove. *Id.* at 1076-77. If it is, the court must then balance the probative value of the evidence against any unfair prejudice under Rule 403. *Id.* at 1077. The evidence may not be admitted if the probative value is substantially outweighed by the danger of unfair prejudice. *Id.*; *see also* FED. R. EVID. 403. If Rule 403 is satisfied, "the district court must 'clearly, simply, and correctly' instruct the jury as to the *specific* purpose for which they may consider the evidence." *Merriweather*, 78 F.3d at 1077 (quoting *United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994)) (emphasis in original).

The prosecution argued, and the district court agreed, that the evidence of Defendant's prior drug deals from the Birmingham Conspiracies was admissible for the purpose of demonstrating Defendant's specific intent. We agree.

In *United States v. Johnson*, 27 F.3d 1186 (6th Cir. 1994), we explained how to properly determine whether prior acts are admissible to establish a defendant's intent. *Id.* at 1191-93. Although intent is not put in issue every time a defendant pleads not guilty, "[w]e recognize[d] that there is a class of cases in which intent is in issue precisely because a specific intent, separate and apart from underlying prohibited conduct, is made an element of the crime charged." *Id.* at 1192. One such type of crime is possession of cocaine with intent to distribute. *Id.* In *Johnson*, we stated the following rule: "where there is thrust upon the government, either by virtue of the defense raised by the defendant or by virtue of the elements of the crime charged, the affirmative duty to prove that the underlying prohibited act was done with a specific criminal intent, other acts evidence may be introduced under Rule 404(b)." *Id.* Accordingly, the government was permitted to prove Defendant's specific intent to distribute cocaine through evidence of prior acts. *See United States*

11

*v. Trujillo*, 376 F.3d 593, 605 (6th Cir. 2004) (holding the second step in the Rule 404(b) analysis satisfied because the defendant was charged with a specific intent crime).

**B.        Was the Evidence Admissible Under Rule 403?**

As we noted in *Johnson*, simply because the government is permitted to introduce prior acts for the purpose of demonstrating the defendant's specific intent to commit the charged crime does not mean such evidence will automatically be admitted. *Johnson*, 27 F.3d at 1192. The judge must still determine that the probative value of such evidence is not substantially outweighed by the danger of unfair prejudice. *Id.*; *see also* FED. R. EVID. 404(b). We afford district court judges "very broad discretion in determining whether the danger of undue prejudice outweighs the probative value of the evidence." *United States v. Mack*, 258 F.3d 548, 555 (6th Cir. 2001) (quoting *United States v. Vance*, 871 F.2d 572, 576 (6th Cir. 1989)) (quotation marks omitted). We use an abuse-of-discretion standard when reviewing a district court's evaluation of unfair prejudice and probative value under Rule 403. *Id.*

There are many considerations a judge should evaluate when determining whether to admit potentially prejudicial evidence. "One factor in balancing unfair prejudice against probative value under Rule 403 is the availability of other means of proof." *Merriweather*, 78 F.3d at 1077 (citing *Huddleston v. United States*, 485 U.S. 681, 688 (1988)). Another consideration is whether the impermissible inferences the jury might draw from the evidence will "drown out" the permissible conclusions the jury is permitted to make under Rule 404(b). *Id.* This risk can be reduced by a clear, concise limiting instruction indicating the specific purpose for which the evidence is admissible. *Id.* We presume juries correctly follow instructions that are given to them. *Murphy*, 241 F.3d at 451. The amount of detail and specificity with which the prior acts are described impacts this analysis.

12

*See, e.g.*, *United States v. Cano*, No. 97-1428, 1998 WL 889772, at \*5 (6th Cir. Dec. 8, 1998) ("Furthermore, the limited nature of the evidence and the lack of specificity prevents any potential prejudice from outweighing the probative nature of the statement.").

The district court judge conducted the following Rule 403 balancing:

> I don't think that there is much, much of a question here as to 403 balancing of it. I mean, it is something which the government has to prove. We've got a lot of evidence of cocaine transactions in this case, which I don't think that it's unfairly prejudicial to the defendant to have this piece of evidence come in.

(R. 303 at 308:1-7.) The trial judge went on to offer, "I can probably, if [defense counsel] want[s] me to, I can give you a jury instructions which will cover other acts here. If that's what you want."

(*Id.* at 308:7-9.) At Defendant's trial, the following jury instruction was given:

> You have heard testimony that the defendant committed crimes that the defendant says are other than the ones charged in the indictment. If you find that the defendant did those other crimes, you can consider the evidence only as it relates to the government's claim on the defendant's intent. You must not consider it for any other purpose.
>
> Remember that the defendant is on trial here only for the crimes charged in the indictment, not for any other acts. Do not return a guilty verdict unless the government proves the crimes charged in the indictment beyond a reasonable doubt.

(R. 304 at 485:13-24.) Defendant's counsel did not object to these instructions after reviewing them before they were provided to the jury. (*Id.* at 510:3-7.)

Relying on our decision in *Merriweather*, Defendant argues that because there were other ways the government could prove his specific intent, the district court erred in ruling the evidence was admissible. In *Merriweather*, we reversed the defendant's conviction for conspiracy to distribute cocaine because the government introduced tape recordings of drug transactions from conspiracies that were separate and distinct from the indicted conspiracy. *See* 78 F.3d at 1079.

13

While the facts of that case mirror the instant case in some respects, *Merriweather* is distinguishable in many ways. First, one of the major issues we had in *Merriweather* was that the district court judge gave several conflicting and erroneous jury instructions regarding what purposes the jury could use the tape recordings for during its deliberations. *Id.* at 1076. The trial court in that case instructed the jury that it could use the evidence for essentially all of the purposes stated in Rule 404(b) when several of those were not in issue. *Id.* In *Merriweather*, the district court's final instructions permitted the jury to consider the inappropriately admitted tapes for the purposes of opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake when only identity and intent were at issue. *Id.* at 1079. Furthermore, the judge's mid-trial instruction and final instruction regarding the "proper purposes" for which the evidence could be used were different. *Id.* at 1076.

Defendant is correct that in *Merriweather,* we found the government's use of otherwise admissible audio tapes to establish that the identity of the speaker in those tapes was the defendant was unfairly prejudicial because the government had other ways to prove his identity. *Id.* at 1077. We stated, however, that "a clear and concise instruction identifying for the jurors the specific purpose for which the evidence was admissible" could have reduced the risk of unfair prejudice. *Id.* Furthermore, the district court in *Merriweather* failed to even conduct a Rule 403 balancing analysis—a *per se* violation of Rule 404(b)'s application. *Id.* at 1078.

We find that in the case at bar, the district court's clear, concise, and legally correct limiting instruction reduced the risk of unfair prejudice to Defendant. We cannot conclude that the district court abused its discretion in determining that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Therefore, we **AFFIRM** its decision to admit the evidence of the Birmingham Conspiracies under Rule 404(b).

14

**b.     Defendant's Motion to Suppress the Sixth Street Search**

Defendant argues that the district court erred by denying his motion to suppress the evidence found as a result of the search of his Sixth Street residence.  Specifically, he contends that the affidavit issuing magistrate judge relied upon when authorizing the warrant lacked the necessary nexus between the drug-trafficking allegations and the Sixth Street house.  Furthermore, Defendant argues that the good-faith exception to the exclusionary rule does not apply.

"When reviewing the denial of a motion to suppress, we review a district court's factual findings for clear error, while conclusions of law are reviewed *de novo*."  *Murphy*, 241 F.3d at 456.  The evidence is viewed in the light most favorable to the government.  *Id.*  Probable cause determinations made by magistrate judges are given great deference, and are only set aside if they are "arbitrarily exercised."  *Id.* at 457 (quoting *United States v. Weaver*, 99 F.3d 1372, 1376 (6th Cir. 1996)).   For the following reasons, we find that Defendant's arguments are without merit and **AFFIRM** the district court's decision to deny Defendant's motion to suppress.

**1.     Did the Applying Officer's Affidavit Supply Enough Evidence to Demonstrate Probable Cause Existed to Search the Sixth Street Residence?**

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const. amend. IV; *see also United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc).  When assessing whether an affidavit contains sufficient evidence to establish probable cause to issue a search warrant,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

15

*Carpenter*, 360 F.3d at 594 (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)).  In order to sanction a search, the affidavit must demonstrate that there is a "nexus between the place to be searched and the evidence sought."  *Id.* (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)).  The affidavit must suggest that there is probable cause to believe that the specific things to be searched for and seized will be found there, and not merely that the owner of the property is suspected of a crime.  *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)).  Defendant argues that the affidavit submitted by TFO Wiggley failed to establish the requisite nexus between the evidence of drug trafficking sought to be found and the Sixth Street residence.

It is well established that if there is probable cause to suspect an individual of being an on-going drug trafficker, there is a sufficient nexus between the evidence sought and that individual's home.  *See, e.g.*, *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009) ("[A] sufficient nexus was provided by the inference that evidence of drug trafficking would be found at the residence of one who is engaged in ongoing drug trafficking."); *United States v. Goward*, 188 F. App'x 355, 358-60 (6th Cir. 2006); *United States v. Miggins*, 302 F.3d 384, 393-94 (6th Cir. 2002) (reversing the district court's finding that there was no probable cause and holding that it is reasonable to infer a drug dealer keeps drugs and evidence of drug distribution at his home, even though no drug trafficking is seen there); *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998) (quoting *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)) ("[I]n the case of drug dealers, evidence is likely to be found where the dealers live[.]").

In *Gunter*, the government presented the issuing magistrate judge with evidence that Gunter repeatedly purchased several kilograms of cocaine.  551 F.3d at 481.  We held that, as a result of

16

these large and sustained transactions, it was reasonable to conclude that Gunter was engaged in ongoing drug trafficking, and accordingly, that it was reasonable to infer that evidence of such activities would be found in his home. *Id.*

In *Goward*, we held that an affidavit containing credible and verified allegations that the defendant is engaged in drug trafficking, verification that the defendant lives at a particular address, and an affiant-officer's experience and familiarity with the habits of drug traffickers can establish probable cause to search the defendant's residence despite the fact that there was no evidence of criminal wrongdoing occurring at the home. 188 F. App'x at 358-60.

Defendant argues that we should find that the affidavit did not provide the necessary nexus based on our decision in *McPhearson*,. In *McPhearson*, the defendant was arrested for assault outside of his home pursuant to an arrest warrant. 469 F.3d at 520. While performing a pat-down search incident to the defendant's arrest, an officer located a small amount of crack cocaine in his front pocket. *Id.* After the defendant refused the officers permission to search his house, they obtained a search warrant based on the crack found during the arrest. *Id.* at 521. We affirmed the trial court's decision to suppress the evidence found as a result of the search because the submitting officer's affidavit did not establish a nexus between the place to be searched and the evidence to be sought. *Id.* at 524.

*McPhearson*, however, does not aid Defendant's cause, and, in fact, a careful reading of the case only reinforces our decision to affirm the district court. In *McPhearson*, we drew a sharp distinction between the defendant in that case—who was arrested for assault, and found with only a small amount of drugs on his person—and suspects believed to be ongoing drug traffickers. *See id.* Although the prosecutor in *McPhearson* cited several cases where we found probable cause of

17

drug trafficking sufficient to provide a nexus between evidence of drug dealing and the suspect's home, we stated "[b]ut in all those cases, the affidavits contained an additional fact that permitted the magistrate to draw the inference that evidence of wrongdoing would be found in the defendants' homes—namely, the independently corroborated fact that the defendants were *known drug dealers* at the time the police sought to search their homes." *Id.* (emphasis added).

Defendant also directs the Court's attention to *United States v. Frazier*, 423 F.3d 526 (6th Cir. 2005), in which we stated that none of our cases "supports the proposition that the defendant's status as a drug dealer, standing alone gives rise to a fair probability that drugs will be found in his home." *Id.* at 533. Although such language seems to support Defendant's argument, the reason why we held the affidavit in *Frazier* insufficient to establish probable cause to search a suspected drug dealer's house was because it was based solely on the uncorroborated allegations of unidentified informants. *Id.* at 532-33. Indeed, immediately after the previously quoted language this Court explained:

> Where, as here, the warrant affidavit is based almost exclusively on the uncorroborated testimony of unproven confidential informants (none of whom witnessed illegal activity on the premises of the proposed search), the allegation that the defendant is a drug dealer, without more, is insufficient to tie the alleged criminal activity to the defendant's residence.

*Id.* at 533; *see also United States v. Bethal*, 245 F. App'x 460, 474-75 (6th Cir. 2007) (McKeague, J., dissenting) (explaining that verified evidence of ongoing drug trafficking provides the requisite nexus, but uncorroborated allegations of drug dealing or evidence of drug use or possession alone do not).

Here, there was sufficient corroborated evidence for the applying officer and issuing magistrate to believe that Defendant was an ongoing drug trafficker.[4] The affidavit offered a detailed account of Agent Melton and the DEA's investigation of Defendant. (R. 108-1 at 6-7.) TFO Wiggley described the recorded phone calls between Goff and Defendant, how Defendant fled from the controlled buy, and his arrest. (*Id.*) Although the affidavit refers to Goff only as the DEA's "Source of Information," all of the information he provided was independently verified by law enforcement agents—indeed, Goff was calling Defendant from the DEA's office in Chattanooga.

Moreover, additional evidence strengthens the nexus between the evidence being sought and Defendant's Sixth Street home. Officers first linked Defendant to the Sixth Street address by looking up the registration for the green Honda Accord Defendant was driving to the scene of the expected drug bust. The vehicle was registered to Anita Murdock. When agents spoke to Ms. Murdock, she informed them that the car belonged to her daughter, Oronda Bullard Feagan. She also told officers that Ms. Feagan and Defendant drove the car and lived together at the Sixth Street address. Agents arrived at the Sixth Street address and found that no one was there. Eventually, Ms. Feagan came home. She stated that she and Defendant lived there and that Defendant kept his clothes and other belongings in the house. Defendant also had a 2007 GMC Yukon SUV registered in his name at the Sixth Street address. All of this information was contained in TFO Wiggley's affidavit. (R. 108-1 at 7.) As a result, the affidavit contained probable cause that Defendant was a drug trafficker and more than enough evidence to verify that he lived at the Sixth Street residence.

---

[4] Defendant does not assert that there are any misrepresentations in the affidavit or that TFO Wiggley knowingly or intentionally misled the magistrate judge. (R. 171 at 9 n.6.)

We conclude that these facts, coupled with TFO Wiggley's opinion that drug dealers often keep drugs and other evidence of drug trafficking in their homes, provided sufficient probable cause and the requisite nexus to justify the search of the Sixth Street home. Because we find there was probable cause to support issuing the search warrant, we need not engage in a good-faith exception analysis under *Leon*.

### c. Venue

Finally, Defendant claims that because he never entered Tennessee, and because there is no evidence of any action, activity, or conduct on his part in that state, the Eastern District of Tennessee was an inappropriate venue. We find this argument to be without merit, and address it only briefly.

Venue is proper in the state or district where the offense was committed. "For drug conspiracies, venue is proper in any district where the conspiracy was formed or where an overt act in furtherance of the conspiracy was performed." *United States v. Crozier*, 259 F.3d 503, 519 (6th Cir. 2001); *see also United States v. Williams*, 274 F.3d 1079, 1083-84 (6th Cir. 2001) (quoting *United States v. Scaife*, 749 F.2d 338, 346 (6th Cir. 1984)). The defendant does not need to physically be present in the district at any time if this standard is satisfied. *Crozier*, 259 F.3d at 519.

Although Defendant may never have stepped foot in Tennessee, there are many examples of overt acts that were committed in furtherance of the conspiracy by his co-conspirators in the Eastern District of Tennessee. For example, one of Defendant's co-conspirators, David Rector, received cocaine shipments in Tennessee. Additionally, Sanchez traveled into Tennessee after picking up $38,000 from Defendant. (R. 303 at 405-06.) In fact, Defendant called Sanchez the day after he left for Tennessee to make sure he made it in safely. (*Id.* at 410.) Sanchez was arrested in a Tennessee motel located in the Eastern District of Tennessee, a short time later. (*Id.*) These facts are sufficient

20

to establish the Eastern District of Tennessee as a proper venue (albeit not the *only* proper venue) to try Defendant's case in.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the jury's verdict and the district court proceedings below.